## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**RITA NICOLE GUERIN,**

      **Plaintiff,**

      **v.**

**CAROLYN W. COLVIN, Acting
Commissioner of Social Security,**

      **Defendant.**

**No. 13 C 6964**

**Magistrate Judge Mary M. Rowland**

## MEMORANDUM OPINION AND ORDER

Plaintiff Rita Nicole Guerin filed this action seeking reversal of the final decision of the Commissioner of Social Security denying her application for Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) under Titles II and XVI of the Social Security Act (Act). 42 U.S.C. §§ 405(g), 423 et seq., 1381 et seq. The parties have consented to the jurisdiction of the United States Magistrate Judge, pursuant to 28 U.S.C. § 636(c), and filed cross motions for summary judgment. For the reasons stated below, the case is remanded for further proceedings consistent with this Opinion.

## I. THE SEQUENTIAL EVALUATION PROCESS

To recover DIB or SSI, a claimant must establish that he or she is disabled within the meaning of the Act. *York v. Massanari*, 155 F. Supp. 2d 973, 977 (N.D.

Ill. 2001).[1] A person is disabled if he or she is unable to perform "any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. §§ 404.1505(a), 416.905(a). In determining whether a claimant suffers from a disability, the Commissioner conducts a standard five-step inquiry:

1. Is the claimant presently unemployed?
2. Does the claimant have a severe medically determinable physical or mental impairment that interferes with basic work-related activities and is expected to last at least 12 months?
3. Does the impairment meet or equal one of a list of specific impairments enumerated in the regulations?
4. Is the claimant unable to perform his or her former occupation?
5. Is the claimant unable to perform any other work?

20 C.F.R. §§ 404.1509, 404.1520, 416.909, 416.920; *see Clifford v. Apfel*, 227 F.3d 863, 868 (7th Cir. 2000). "An affirmative answer leads either to the next step, or, on Steps 3 and 5, to a finding that the claimant is disabled. A negative answer at any point, other than Step 3, ends the inquiry and leads to a determination that a claimant is not disabled." *Zalewski v. Heckler*, 760 F.2d 160, 162 n.2 (7th Cir. 1985). "The burden of proof is on the claimant through step four; only at step five does the burden shift to the Commissioner." *Clifford*, 227 F.3d at 868.

---

[1] The regulations governing the determination of disability for DIB are found at 20 C.F.R. § 404.1501 et seq. The SSI regulations are set forth at 20 C.F.R. § 416.901 et seq. The standards for determining DIB and SSI are virtually identical. *Craft v. Astrue*, 539 F.3d 668, 674 n.6 (7th Cir. 2008) ("Although the Code of Federal Regulations contains separate sections for DIB and SSI, the processes of evaluation are identical in all respects relevant to this case."). Accordingly, this Court cites to both DIB and SSI cases.

## II. PROCEDURAL HISTORY

Plaintiff applied for DIB and SSI on January 16, 2009, alleging that she became disabled on January 1, 2005, because of brain injury, anxiety, depression, PTSD, back problems, and memory problems.[2] (R. at 81, 102, 107, 114, 118). The application was denied initially and on reconsideration, after which Plaintiff filed a timely request for a hearing. (*Id.* at 74–77, 81, 98, 103, 111, 115, 119). On March 17, 2011,[3] Plaintiff, represented by counsel, testified at a hearing before an Administrative Law Judge (ALJ). (*Id.* at 17–60, 81). The ALJ also heard testimony from Leslie Freels Lloyd, a vocational expert (VE). (*Id.* at 17–60, 81, 131–32).

The ALJ denied Plaintiff's request for benefits on July 28, 2011. (R. at 81–91). Applying the five-step sequential evaluation process, the ALJ, at step one, reserved a finding on whether Plaintiff had engaged in substantial gainful activity since January 1, 2005, the alleged onset date. (*Id.* at 83–84). At step two, the ALJ found that Plaintiff's migraine headaches, bipolar disorder, PTSD, and substance abuse are severe impairments. (*Id.* at 84). At step three, the ALJ determined that Plaintiff does not have an impairment or combination of impairments that meet or medically

---

[2] This is Plaintiff's third application for benefits. (R. at 81). She filed her most recent application on June 7, 2006, which was denied on March 27, 2008. (*Id.* at 65–72, 81). While res judicata would generally preclude an onset date prior to the date of the previous decision denying benefits, *Groves v. Apfel*, 148 F.3d 809, 810 (7th Cir. 1998), "[a]dministrative *res judicata* is a discretionary matter and the ALJ must apply *res judicata* if she wishes to bar the evidence from a prior decision," *Hughes v. Colvin*, No. 14 C 1883, 2015 WL 2259833, at *12 (N.D. Ill. May 12, 2015); *accord Johnson v. Sullivan*, 936 F.2d 974, 976 (7th Cir. 1991). Here, because the ALJ did not apply res judicata to bar evidence from the previous application, the ALJ must render a decision on the merits of the current application based upon the entire record. *Hughes*, 2015 WL 2259833, at *12.

[3] The hearing transcript incorrectly lists the hearing date as March 27, 2011. (*Compare* R. at 17, 19, 69 *with id.* at 81, 121, 130, 133–35).

equal the severity of any of the listings enumerated in the regulations. (*Id.* at 84–85).

The ALJ then assessed Plaintiff's residual functional capacity (RFC)[4] and determined that she can perform a full range of work at all exertional levels but with these nonexertional limitations: "no public contact work, no team coordination, must work alone, only routine, repetitive work that stays the same day-to-day to limit the number of new details that require learning." (R. at 87–90). Based on Plaintiff's RFC and the VE's testimony, the ALJ determined at step four that Plaintiff is capable of performing past relevant work as a hand packer and personal assistant. (*Id.* at 90). Alternatively, based on Plaintiff's RFC, age, education, and the VE's testimony, the ALJ determined at step five that there are jobs that exist in significant numbers in the national economy that Plaintiff can perform such as packer. (*Id.* at 90–91). Accordingly, the ALJ concluded that Plaintiff is not suffering from a disability, as defined by the Act. (*Id.* at 91).

The Appeals Council denied Plaintiff's request for review on September 7, 2012. (R. at 4–7). Plaintiff now seeks judicial review of the ALJ's decision, which stands as the final decision of the Commissioner. *Villano v. Astrue*, 556 F.3d 558, 561–62 (7th Cir. 2009).

---

[4] Before proceeding from step three to step four, the ALJ assesses a claimant's residual functional capacity. 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4). "The RFC is the maximum that a claimant can still do despite his mental and physical limitations." *Craft*, 539 F.3d at 675–76.

# III. STANDARD OF REVIEW

Judicial review of the Commissioner's final decision is authorized by § 405(g) of the SSA. In reviewing this decision, the Court may not engage in its own analysis of whether the plaintiff is severely impaired as defined by the Social Security Regulations. *Young v. Barnhart*, 362 F.3d 995, 1001 (7th Cir. 2004). Nor may it "reweigh evidence, resolve conflicts in the record, decide questions of credibility, or, in general, substitute [its] own judgment for that of the Commissioner." *Id.* The Court's task is "limited to determining whether the ALJ's factual findings are supported by substantial evidence." *Id.* (citing § 405(g)). Evidence is considered substantial "if a reasonable person would accept it as adequate to support a conclusion." *Indoranto v. Barnhart*, 374 F.3d 470, 473 (7th Cir. 2004); *see Moore v. Colvin*, 743 F.3d 1118, 1120–21 (7th Cir. 2014) ("We will uphold the ALJ's decision if it is supported by substantial evidence, that is, such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.") (citation omitted). "Substantial evidence must be more than a scintilla but may be less than a preponderance." *Skinner v. Astrue*, 478 F.3d 836, 841 (7th Cir. 2007). "In addition to relying on substantial evidence, the ALJ must also explain his analysis of the evidence with enough detail and clarity to permit meaningful appellate review." *Briscoe ex rel. Taylor v. Barnhart*, 425 F.3d 345, 351 (7th Cir. 2005).

Although this Court accords great deference to the ALJ's determination, it "must do more than merely rubber stamp the ALJ's decision." *Scott v. Barnhart,* 297 F.3d 589, 593 (7th Cir. 2002) (citation omitted). "This deferential standard of review is

weighted in favor of upholding the ALJ's decision, but it does not mean that we scour the record for supportive evidence or rack our brains for reasons to uphold the ALJ's decision. Rather, the ALJ must identify the relevant evidence and build a 'logical bridge' between that evidence and the ultimate determination." *Moon v. Colvin*, 763 F.3d 718, 721 (7th Cir. 2014). Where the Commissioner's decision "lacks evidentiary support or is so poorly articulated as to prevent meaningful review, the case must be remanded." *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

## IV. RELEVANT MEDICAL EVIDENCE

Plaintiff began treating with John J. Schoenwald, M.D., her primary care physician, in January 2003. (R. at 546). As a result of an automobile accident in September 2004 when she was 19, Plaintiff suffered a head injury, broken left clavicle, and displacement of the humerus. (R. at 285, 578). She developed symptoms of PTSD with difficulty falling asleep, early morning awakening, crying, and anxiety. (*Id.* at 68). She also developed severe headaches and a CT scan indicated type 1 Chiari malformation (CM) in the cerebellar area, causing dizziness.[5] (*Id.* at 292, 294, 578). Dr. Schoenwald referred her to a psychiatrist for evaluation and treatment of her PTSD symptoms. (*Id.* at 305).

On October 12, 2004, Rumen Slavkov, M.D., conducted an initial psychiatric evaluation. (R. at 305–09). Plaintiff reported flashbacks, nightmares, chronic fear,

---

[5] "Chiari malformations (CMs) are structural defects in the cerebellum, the part of the brain that controls balance. . . . Type I involves the extension of the cerebellar tonsils (the lower part of the cerebellum) into the foramen magnum, without involving the brain stem." <http://www.ninds.nih.gov/disorders/chiari/detail_chiari.htm>

increased startle response, emotional numbness, social isolation, and avoidance. (*Id.* at 305–06). Plaintiff's mother described frequent anger, frustration, withdrawal, sadness, and depression. (*Id.* at 306). On examination, Dr. Slavkov observed dysthymic mood; tearful, euthymic and slightly labile affect; decreased concentration; and fair insight and judgment. (*Id.* at 308). He diagnosed PTSD and bipolar II disorder, and assigned a Global Assessment of Functioning (GAF) score of 55.[6] Dr. Slavkov started Plaintiff on psychotherapy and prescribed Klonopin, citalopram, and Lamictal.[7]

On November 16, 2004, Plaintiff reported symptoms consistent with attention deficit hyperactivity disorder (ADHD). (R. at 310). Dr. Slavkov conducted an examination, finding no change from the October examination, diagnosed bipolar II disorder and PTSD, with a need to rule out ADHD. (*Id.*). He continued Klonopin, Celexa and Lamictal, and started a therapeutic trial of Ritalin.[8] (*Id.* at 310–11). Plaintiff saw Dr. Slavkov on a regular basis throughout 2005. (*Id.* at 312–29). After exhibiting initial improvement, Plaintiff's anxiety returned. (*Id.* at 318). In October 2005, she reported difficulty focusing and concentrating. (*Id.* at 328).

---

[6] The GAF includes a scale ranging from 0–100, and indicates a "clinician's judgment of the individual's overall level of functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 32 (4th ed. Text Rev. 2000) (hereinafter *DSM-IV*). A GAF score of 51–60 indicates moderate symptoms (e.g., flat affect and circumlocutory speech, occasional panic attacks) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers). *DSM-IV* at 34.

[7] Klonopin (clonazepam) is used to treat seizure disorders or panic disorder. Celexa (citalopram) is used to treat depression. Lamictal (lamotrigine) is an anti-epileptic medication, which is also used to delay mood episodes in adults with bipolar disorder (manic depression). <www.drugs.com>

[8] Ritalin (methylphenidate) is a central nervous system stimulant that is used to treat attention deficit disorder (ADD) and ADHD. <www.drugs.com>

In February 2005, Plaintiff underwent suboccipital craniotomy, C1 laminectomy and duraplasty for decompression of the CM. (R. at 68). Plaintiff claims that since the surgery, she has trouble remembering and concentrating and cannot function in school. (*Id.* at 578).

On August 14, 2006, Plaintiff complained of headaches, back problems, poor memory, and chronic insomnia. (R. at 367). On examination, Plaintiff was alert and oriented but displayed anxiety and depression symptoms. (*Id.*). Dr. Schoenwald diagnosed depression with difficulty focusing and possible memory impairment, with a need to determine whether her poor school performance was a manifestation of depression or organic memory loss, and referred her for a psychoeducation study. (*Id.*).

On August 7, 2006, John L. Peggau, Psy.D., performed a consultative examination. (R. at 331–34). Dr. Peggau reviewed a 2004 psychiatric evaluation and obtained a history of Plaintiff's symptoms from her and her mother. (*Id.* at 331). Plaintiff is easily startled and complained of "really bad headaches" and poor memory. (*Id.*). Her mother stated that Plaintiff is socially isolated and has to be reminded to complete her household chores. (*Id.*). Plaintiff denied any current or past use of drugs or alcohol. (*Id.* at 332). On examination, Dr. Peggau found Plaintiff's mood congruent and hygiene appropriate. (*Id.*). Her sensorium and mental capacity were alert in consciousness and she was appropriately oriented. (*Id.*). She displayed some difficulty with long term memory. (*Id.* at 332, 333). Dr. Peggau diagnosed PTSD by history with a need to rule out a cognitive disorder and assigned a GAF

score of 60. (*Id.* at 333). He concluded that Plaintiff is able to understand, remember, sustain concentration, and persist in tasks. (*Id.*). She is able to interact socially and adapt to work settings. Dr. Peggau opined that Plaintiff's history of trauma is manageable in work settings and she can manage her own finances. (*Id.*).

On August 22, 2006, Terrance G. Lichtenwald, Ph.D., conducted a psychoeducational study. (R. at 336–59). He reviewed medical records, obtained a history from Plaintiff, and conducted a number of tests. (*Id.* at 336–37). Dr. Lichtenwald opined that Plaintiff has a possible cerebral dysfunction, resulting in significant impairments in the following areas: (1) the ability to immediately recognize the symbolic significance of numbers and letters, (2) the ability to scan a page continually to identify the next number or letter in sequence, (3) the flexibility to integrate numerical and alphabetical series, and (4) the ability to complete these tasks under time pressure. (*Id.* at 346–47). Dr. Lichtenwald concluded that Plaintiff suffers from a possible brain injury, which is causing dyslexic behaviors such as the inability to process instructions quickly or to read words rapidly. (*Id.*).

On January 15, 2009, Plaintiff presented with symptoms of reactive depression; she was upset and crying. (R. at 360). She reported occasional headaches and insomnia. (*Id.*). She noted having trouble in school despite special accommodations, and reported continuing difficulty with comprehension and understanding. (*Id.*). Plaintiff stated that she had been terminated from several jobs after she was unable to remember when she was scheduled to work. (*Id.*). Dr. Schoenwald concluded that Plaintiff has deficits in comprehension and memory and prescribed Celexa to treat

her depression and anxiety. (*Id.*). Later that year, Dr. Schoenwald referred Plaintiff for psychiatric evaluation of her opiate addiction and depression. (R. at 578).

On June 15, 2009, Gerald K. Hoffman, M.D., performed a consultative examination. (R. at 452–53). He reviewed the medical file and obtained a history of Plaintiff's symptoms. (*Id.* at 452). Plaintiff was relaxed and cooperative and she reasoned and responded to questions in a logical, coherent, and prompt manner. (*Id.*). She averred that she cannot keep a job because of difficulty remembering and staying focused. (*Id.*). Plaintiff asserted that she has been unable to function since she was seriously injured in a car accident. (*Id.*). She cannot drive because she gets nervous and anxious, fearing another accident. (*Id.*). She has difficulty falling asleep and frequently has nightmares about the accident. (*Id.*). Plaintiff is irritable, socially withdrawn, has difficulty concentrating, and is startled when hearing loud noises. (*Id.*). She denied any use of drugs or alcohol. (*Id.* at 453). She reported that her primary care physician has diagnosed depression and anxiety disorder and prescribed Citalopram, Ambien, and Xanax. (*Id.*). Dr. Hoffman diagnosed PTSD and anxiety and depressive disorder secondary to subjective loss of ability to perform academically and physically. (*Id.*). He found no valid clinical evidence for a cognitive or memory disorder. (*Id.*).

On July 7, 2009, M. W. DiFonso, Psy.D., a nonexamining, state agency physician, reviewed the medical records and completed a Psychiatric Review Technique form. (R. at 459–72). He found Plaintiff partially credible and concluded that the degree of limitation reported in Plaintiff's activities of daily living is not supported

by the medical evidence. (*Id.* at 471). Dr. DiFonso opined that Plaintiff has mild restriction of activities of daily living, mild difficulties in maintaining social functioning, and moderate difficulties in maintaining concentration, persistence, or pace. (*Id.* at 469). Dr. DiFonso also completed a mental RFC. (*Id.* at 473–76). He opined that Plaintiff is moderately limited in the ability to understand, remember, and carry out detailed instructions and in the ability to maintain attention and concentration for extended periods. (*Id.* at 473).

Plaintiff began treating with Ramesh Vemuri, M.D., in September 2009. (R. at 576). On September 8, Plaintiff complained of trouble remembering, concentrating and socializing, inability to function in school, forgetful of even simple instructions, and frequent crying spells. (*Id.* at 578). She takes Vicodin for pain, chronic headaches, and for a "sense of well-being." (*Id.* at 579). Plaintiff acknowledged an opiate addiction—taking excessive dosages of Tylenol No. 3, Vicodin, and oxycodone.[9] (*Id.*). Plaintiff's chronic headaches lead her to the emergency room about once a month where they treat her with IV medications for relief. (*Id.*). In between hospital visits, she is able to treat her headaches with opiates. (*Id.*). On examination, Dr. Vemuri observed an intense and constricted affect, tearful and depressed mood, fairly good recent and remote memory, and grossly intact concentration. (*Id.*). He diagnosed opiate addiction and probable cognitive deficits secondary to head injury and referred her for a neuropsychological evaluation. (*Id.* at 579–80). Dr. Vemuri discon-

---

[9] Tylenol No. 3 contains acetaminophen and codeine and is used to relieve moderate to severe pain. Vicodin contains acetaminophen and hydrocodone and is also used to relieve moderate to severe pain. Oxycodone is a narcotic used to treat moderate to severe pain. <www.drugs.com>

tinued Seroquel and Adderall, continued Celexa, and prescribed Suboxone.[10] (*Id.* at 578–79).

Robert L. Meyer, Ph.D., conducted a neuropsychological evaluation on December 18, 2009. (R. at 530–35). He conducted a clinical interview and performed multiple tests to assess Plaintiff's cognitive, memory, and executive functioning abilities. (*Id.* at 530). Plaintiff reported that ever since her automobile accident, she has experienced intense headaches, deteriorating vision, and pronounced memory impairments. (*Id.*). Dr. Meyer concluded that Plaintiff's immediate and general memory abilities appear affected by the accident. (*Id.* at 535). These memory impairments affect her ability to remember information immediately after a visual and oral presentation, as well as to remember information after a delay. (*Id.*). Dr. Meyer opined that Plaintiff's "memory impairments suggest she will likely have limited ability to thrive in most academic and occupational settings. Further, these impairments may lead to a poor ability to independently engage in activities of daily living." (*Id.*).

On January 1, 2010, after seeing Plaintiff two to three times a year since January 2003, Dr. Schoenwald completed a Psychiatric Report. (R. at 546–49). He diagnosed major depressive disorder, recurrent and severe, without psychoses. (*Id.* at 546). He opined that Plaintiff has serious limitations with the ability to complete

---

[10] Seroquel (quetiapine) is an antipsychotic medicine used to treat bipolar disorder and is also used together with antidepressant medications to treat major depressive disorder. Adderall contains a combination of amphetamine and dextroamphetamine and is used to treat ADHD. Suboxone is an opiate that contains buprenorphine and naloxone and is used to treat narcotic addiction. <www.drugs.com>

household duties; independently initiate, sustain or complete tasks; understand, carry out and remember instructions on a sustained basis; respond appropriately to supervision, coworkers, and customary work pressures; perform tasks on an autonomous basis without direct step-by-step supervision and direction; and perform tasks on a sustained basis without undue interruptions or distractions. (*Id.* at 548–49).

Dr. Schoenwald also completed a Neurological Report.[11] (R. at 553–58). He noted that Plaintiff fatigues easily and her memory is impaired and getting progressively worse. (*Id.* at 553). He opined that Plaintiff's executive functioning capacities are impaired and her neurological and psychological problems combine to preclude her from employment. (*Id.* at 558).

On June 15, 2010, after treating Plaintiff once a month since September 2009, Dr. Vemuri summarized his findings. (R. at 581–82). He has tried multiple combinations of medicines without any long-lasting improvements. (*Id.* at 581). Plaintiff continues to be depressed, hopeless, and helpless with self-blame. (*Id.*). She complains of lack of energy and ambition, does not leave the house or engage in social activities, and lacks both energy and motivation. (*Id.*). Dr. Vemuri diagnosed bipolar disorder, mixed, probably secondary to head injury, and assigned a GAF score of 30.[12] (*Id.* at 582). He discontinued Celexa and added Effexor and Strattera to ad-

---

[11] Although the Neurological Report is not dated, it was submitted at the same time as the Psychiatric Report. (R. at 546–61).

[12] A GAF of 30 indicates that "Behavior is considerably influenced by delusions or hallucinations OR serious impairment in communication or judgment (e.g., sometimes incoher-

dress Plaintiff's concentration and focus.[13] (*Id.*). Dr. Vemuri opined that because Plaintiff has failed to respond to various medications, her prognosis is "poor." (*Id.*).

In January 2011, Plaintiff began treating with Regina B. Bielkus, M.D., a Board Certified Neurologist, for evaluation of her headaches and numbness in both upper and lower extremities. (R. at 634). An MRI scan of Plaintiff's brain was generally unremarkable. (*Id.*). On February 17, 2011, Plaintiff complained of intermittent headaches occurring two to three times per week and numbness and tingling affecting both hands and feet especially at night when she is attempting to sleep. (*Id.*). Dr. Bielkus diagnosed migraine headaches and paresthesias affecting both upper and lower extremities and prescribed Inderal.[14] (*Id.*).

On March 8, 2011, Dr. Vemuri completed a Medical Opinion Re: Ability to Do Work-Related Activities. (R. at 583–86). He noted that Plaintiff has chronic headaches and significant cognitive deficits from head injury and major depression that does not respond to medications. (*Id.* at 585). Dr. Vemuri opined that Plaintiff has no useful ability to remember work-like procedures, maintain attention and regular attendance, sustain an ordinary routine without special supervision, perform in coordination or proximity to others without being distracted, complete a normal

---

ent, acts grossly inappropriately, suicidal preoccupation) or inability to function in almost all areas (e.g. stays in bed all day, no job, home or friends)." *DSM-IV* at 34.

[13] Effexor (venlafaxine) is an antidepressant used to treat major depressive disorder, anxiety, and panic disorder. Strattera (atomoxetine) affects chemicals in the brain and nerves that contribute to hyperactivity and impulse control and is used to treat ADHD. <www.drugs.com>

[14] Inderal (propranolol) is a beta-blocker used to reduce the severity and frequency of migraine headaches. <www.drugs.com>

workday without interruptions from psychologically based symptoms, perform at a consistent pace without an unreasonable number of rest periods, accept instructions and respond appropriately to criticism from supervisors, get along with co-workers or peers without unduly distracting them, respond appropriately to changes in a routine work setting, deal with normal work stress, understand, remember and carry out detailed instructions, set realistic goals or make plans independently of others, deal with stress of semiskilled and skilled work, interact appropriately with the general public, maintain socially appropriate behavior, adhere to basic standards of neatness and cleanliness, travel in unfamiliar places, and use public transportation. (*Id.* at 583–86). He also opined that Plaintiff's impairments would likely cause her to miss four or more days of work per month. (*Id.* at 586).

## V. DISCUSSION

Plaintiff contends that the ALJ (1) improperly weighed the opinions of Drs. Vemuri and Schoenwald; (2) improperly assessed her RFC; and (3) improperly assessed her credibility.

## A. The ALJ Did Not Properly Evaluate the Treating Physicians' Opinions

### 1. *Dr. Vemuri*

Plaintiff began treating with Dr. Vemuri in September 2009. (R. at 576). Over the next year, Dr. Vemuri saw Plaintiff on a monthly basis. (*Id.* at 581–82). In March 2011, Dr. Vemuri provided an opinion on Plaintiff's mental limitations. (*Id.* at 583–86). He noted that Plaintiff has chronic headaches, significant cognitive deficits, and major depression, which have not responded to medications. (*Id.* at 585).

He opined that Plaintiff retains poor-to-no ability to perform most work-related activities on a day-to-day basis in a regular work setting. (*Id.* at 583–86). Dr. Vemuri also concluded that because of her impairments, Plaintiff would likely miss four or more days of work per month. (*Id.* at 586).

The ALJ afforded Dr. Vemuri's opinion "very little weight":

> [Plaintiff] saw psychiatrist Ramesh Vermuri, M.D., on a limited basis, perhaps three times in 2009 and according to Dr. Vermuri, monthly until June 2010. He provided her with a medical assessment, which inferred a poor prognosis despite GAF functioning within the previous twelve months as high as "70". A GAF score of 70 tends to denote only mild longitudinal impact. He notably assumed that [Plaintiff] had not continued to seek opiates, when the record tends to show that as recently as November 2010, she pursued narcotic treatment through the emergency room. . . .

> Dr. Vermuri has less longitudinal familiarity with [Plaintiff's] history than Dr. Schoenwald and Dr. Bielkus. More probably than not, he relied upon her subjective account of functioning to fashion his assessment. It is unlikely that she would be more accurate and specific with him than she was with Dr. Schoenwald and Dr. Bielkus. Accordingly, the undersigned is assigning his medical conclusion very little weight.

(R. at 86–87) (citations omitted).[15]

By rule, "in determining whether a claimant is entitled to Social Security disability benefits, special weight is accorded opinions of the claimant's treating physician." *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 825 (2003). The opinion of a treating source is entitled to controlling weight if the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." 20 C.F.R. § 404.1527(c)(2); *accord*

---

[15] The ALJ incorrectly refers to Dr. Vemuri as Dr. Vermuri. (*Compare* R. at 86–87 *with id.* at 577).

*Roddy v. Astrue*, 705 F.3d 631, 636 (7th Cir. 2013). A treating physician typically has a better opportunity to judge a claimant's limitations than a nontreating physician. *Books v. Chater*, 91 F.3d 972, 979 (7th Cir. 1996); *Grindle v. Sullivan*, 774 F. Supp. 1501, 1507–08 (N.D. Ill. 1991). "More weight is given to the opinion of treating physicians because of their greater familiarity with the claimant's conditions and circumstances." *Gudgel v. Barnhart*, 345 F.3d 467, 470 (7th Cir. 2003). If the treating physician's opinion "is well supported and there is no contradictory evidence, there is no basis on which the administrative judge, who is not a physician, could refuse to accept it." *Bauer v. Astrue*, 532 F.3d 606, 608 (7th Cir. 2008) (citation omitted). "Thus, to the extent a treating physician's opinion is consistent with the relevant treatment notes and the claimant's testimony, it should form the basis for the ALJ's determination." *Bates v. Colvin*, 736 F.3d 1093, 1100 (7th Cir. 2013) (citation omitted). Therefore, an ALJ "must offer 'good reasons' for discounting a treating physician's opinion," and "can reject an examining physician's opinion only for reasons supported by substantial evidence in the record; a contradictory opinion of a non-examining physician does not, by itself, suffice." *Beardsley v. Colvin*, 758 F.3d 834, 839 (7th Cir. 2014) (citing 20 C.F.R. §§ 404.1527(c)(1), 416.927(c)(1)) (other citation omitted).

Under the circumstances, the ALJ's decision to give "very little weight" to Dr. Vemuri's opinion is legally insufficient and not supported by substantial evidence. First, the ALJ erroneously discounted Dr. Vemuri's opinion because it was based on Plaintiff's subjective reports. (R. at 86–87). If an opinion is "based *solely* on the pa-

tient's subjective complaints, the ALJ may discount it." *Ketelboeter v. Astrue*, 550 F.3d 620, 625 (7th Cir. 2008) (emphasis added); *see also Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004) ("[M]edical opinions upon which an ALJ should rely need to be based on objective observations and not amount merely to a recitation of a claimant's subjective complaints."). But here, Dr. Vemuri performed his own cognitive testing and examinations, observing an intense and constricted affect, and a tearful, hopeless, helpless and depressed mood. (R. at 576, 579). Dr. Vemuri also reviewed the 2006 psychoeducational tests conducted by Dr. Lichtenwald, which found cerebral dysfunction, causing dyslexic behaviors and other significant mental impairments. (*Id.* at 336–59, 576). Further, Dr. Vemuri's opinion was based on the testing performed by Dr. Meyer in December 2009, who found significant memory impairments and opined that Plaintiff "will likely have limited ability to thrive in . . . occupational settings." (*Id.* at 535; *see id.* at 576).

Moreover, almost all diagnoses—especially mental health evaluations—require some consideration of the claimant's subjective symptoms, and here, Plaintiff's subjective statements were necessarily factored into Dr. Vemuri's analysis. *See McClinton v. Astrue*, No. 09 C 4814, 2012 WL 401030, at *11 (N.D. Ill. Feb. 6, 2012 ("Almost all diagnoses require some consideration of the patient's subjective reports, and certainly [the claimant's] reports had to be factored into the calculus that yielded the doctor's opinion."). And there is nothing in the record to suggest that Dr. Vemuri disbelieved Plaintiff's descriptions of her symptoms, or that Dr. Vemuri relied more heavily on Plaintiff's descriptions than the test results and his own clini-

cal observations in concluding that Plaintiff was seriously impaired. *See Davis v. Astrue*, No. 11 C 0056, 2012 WL 983696, at *19 (N.D. Ill. March 21, 2012) ("The ALJ fails to point to anything that suggests that the weight [Plaintiff's treating psychiatrist] accorded Plaintiff's reports was out of the ordinary or unnecessary, much less questionable or unreliable."); *see also Ryan v. Comm'r*, 528 F.3d 1194, 1199–200 (9th Cir. 2008) ("[A]n ALJ does not provide clear and convincing reasons for rejecting an examining physician's opinion by questioning the credibility of the patient's complaints where the doctor does not discredit those complaints and supports his ultimate opinion with his own observations.").

Second, the ALJ erred by handpicking which evidence to evaluate while disregarding other critical evidence. *Scrogham v. Colvin*, 765 F.3d 685, 696–99 (7th Cir. 2014); *Myles v. Astrue*, 582 F.3d 672, 678 (7th Cir. 2009). The ALJ cannot discuss only those portions of the record that support his opinion. *See Myles*, 582 F.3d at 678 ("An ALJ may not selectively consider medical reports, especially those of treating physicians, but must consider all relevant evidence. It is not enough for the ALJ to address mere portions of a doctor's report.") (citations omitted); *Murphy v. Astrue*, 496 F.3d 630, 634 (7th Cir. 2007) ("An ALJ cannot disregard medical evidence simply because it is at odds with the ALJ's own unqualified opinion."). Instead, the ALJ must consider all relevant evidence, and may not choose to disregard certain evidence or discuss only the evidence that favors his or her decision. *See Herron v. Shalala*, 19 F.3d 329, 334 (7th Cir. 1994).

Here, the ALJ erroneously concluded that Dr. Vemuri failed to explain the GAF decline from 70 to 30. (R. at 86). Initially, Dr. Vemuri opined that Plaintiff's impairments were due to opiate addiction and an organic mood disorder causing problems with concentration, memory, and comprehension. (R. at 576). However, after successfully detoxing Plaintiff from her opiate addiction and a variety of ADD medications failed to address her impairments, Dr. Vemuri concluded that Plaintiff has a bipolar disorder secondary to her head injury. (*Id.*). He prescribed Celexa to address Plaintiff's depression and Abilify as a mood stabilizer, and when these failed to show much benefit, he substituted Effexor for the Celexa and added Strattera.[16] (*Id.* at 576–77). After trying multiple combinations of medicines without any long-lasting improvements, Dr. Vemuri concluded that Plaintiff's prognosis was "poor" and assigned a GAF score of 30. (*Id.* at 582, 585). Further, Plaintiff has a mood disorder (bipolar disorder), which involves widely fluctuating symptoms. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 401, 4014 (4th ed. Text Rev. 2000) (A mood disorder "may involve depressed mood; markedly diminished interest or pleasure; or elevated, expansive, or irritable mood.").

Third, the ALJ fails to articulate how Plaintiff seeking opiates during a November 2010 emergency room visit undermines Dr. Vemuri's finding five months *earlier* that she had stopped abusing opiates. (*See* R. at 86, 581, 648–49). Indeed, someone with a bipolar disorder or a major depressive disorder, like Plaintiff, often finds it

---

[16] Abilify (aripiprazole) is an antipsychotic medication used to treat the symptoms of psychotic conditions such as schizophrenia and bipolar disorder (manic depression).

difficult to avoid abusing opiates. *Voigt v. Colvin*, 781 F.3d 871, 877 (7th Cir. 2015). Plaintiff's failure to respond to various combination of medications prescribed by Dr. Vemuri likely exacerbates her tendency to abuse opiates.

Finally, the ALJ did not identify any medical evidence that contradicted Dr. Vemuri's opinion. Indeed, Dr. Vemuri's opinion was consistent with the opinions of Drs. Schoenwald and Meyer. Dr. Schoenwald concluded that Plaintiff has serious limitations with the ability to complete household duties; independently initiate, sustain or complete tasks; understand, carry out and remember instructions on a sustained basis; respond appropriately to supervision, coworkers, and customary work pressures; perform tasks on an autonomous basis without direct step-by-step supervision and direction; and perform tasks on a sustained basis without undue interruptions or distractions. (R. at 548–49). He opined that Plaintiff's executive functioning capacities are impaired and her neurological and psychological problems combine to preclude her from employment. (*Id.* at 558). After conducting multiple neuropsychological tests, Dr. Meyer concluded that Plaintiff's memory impairments affect her ability to remember information immediately after a visual and oral presentation, as well as to remember information after a delay. (*Id.* at 535). He opined that Plaintiff's "memory impairments suggest she will likely have limited ability to thrive in most academic and occupational settings." (*Id.*).

The Commissioner contends that Dr. Vemuri's opinion was contradicted by the findings of Drs. Peggau, Lichtenwald, and Hoffman. (Dkt. 24 at 6–7). But the ALJ did not mention any of these findings in his conclusion that Plaintiff's GAF decline

from 70 to 30 was not explained by Dr. Vemuri. (R. at 86). The Court must limit its review to the rationale offered by the ALJ. *See SEC v. Chenery Corp.*, 318 U.S. 80, 90–93 (1943); *accord Hanson v. Colvin*, 760 F.3d 759, 762 (7th Cir. 2014) ("We are particularly concerned about the *Chenery* violations committed by the government because it is a recurrent feature of the government's defense of denials of social security disability benefits, as this court has noted repeatedly.").

The Commissioner also argues that the ALJ found Dr. Vemuri was not a treating source. (Dkt. 24 at 6). But the ALJ's observation that Dr. Vemuri saw Plaintiff on a "limited basis" goes to the weight to be afforded a treating source's opinion, 20 C.F.R. §§ 404.1527(c), 416.927(c), not whether he was a treating source. In any event, Plaintiff's multiple visits with Dr. Vemuri during 2009–2010 likely qualifies him as a treating source. Hearings, Appeals and Litigation Law Manual (HAL-LEX)[17] I-5-4-18 ("[A] 'treating source' is a licensed physician . . . who has an ongoing treatment relationship with the claimant for an impairment or impairments alleged to cause disability. This longitudinal relationship is not determined merely by the number of visits or length of the relationship. In determining whether an ongoing relationship exists, we look at the nature of the medical conditions involved along with the need for and the number of medical visits over a period of time.").

---

[17] HALLEX is a policy manual written to convey "guiding principles, procedural guidance and information to the Office of Hearings and Appeals Staff." HALLEX I–1–001. While the Court is not bound by HALLEX provisions, it "may look to the HALLEX as a guide for procedural rules in Social Security . . . cases." *DiRosa v. Astrue*, No. 10 C 7243, 2012 WL 2885112, at *5 (N.D. Ill. July 13, 2012); *see Davenport v. Astrue*, 417 F. App'x 544, 547–48 (7th Cir. 2011).

### 2. *Dr. Schoenwald*

Dr. Schoenwald started treating Plaintiff in January 2003 and saw her two to three times a year thereafter. (R. at 546–49). In January 2010, he diagnosed major depressive disorder, recurrent and severe, and opined that she had serious limitations with the ability to complete household duties and job-related skills. (*Id.* at 546, 548–49). He concluded that Plaintiff's executive functioning capacities are impaired and her neurological and psychological problems combine to preclude her from employment. (*Id.* at 558).

The ALJ rejected Dr. Schoenwald's opinion without determining its weight:

> Like Dr. Vermuri [*sic*], Dr. Schoenwald seems to have relied on subjective account of capacity and non-objective measures in offering opinions of work ability. . . . He relied in material part upon [Dr. Meyer's] neuro-psychological evaluation to which she self-referred in December 2009. That source in fact documented that she retained an average working memory and an average full scale IQ, which would imply the improbability of significant memory impairment affecting simple work.

(R. at 87) (citations omitted).

Under the circumstances, the ALJ's decision to reject Dr. Schoenwald's opinion is legally insufficient and not supported by substantial evidence. First, the ALJ erroneously discounted Dr. Schoenwald's opinion because it was based on Plaintiff's subjective reports. (R. at 87). On the contrary, Dr. Schoenwald performed his own examinations, observing symptoms of fatigue, anxiety and depression, and reviewed findings by medical specialists, including Drs. Meyer and Vemuri, which he explicitly referred to in his opinion. (*Id.* at 360, 364, 367, 547, 558). Moreover, as discussed above, almost all diagnoses—especially mental health evaluations—require some

consideration of the claimant's subjective symptoms. *See McClinton*, 2012 WL 401030, at *11. And there is nothing in the record to suggest that Dr. Schoenwald disbelieved Plaintiff's descriptions of her symptoms, or that Dr. Schoenwald relied more heavily on Plaintiff's descriptions than the specialists' reports and his own clinical observations in concluding that Plaintiff was seriously impaired. *See Davis*, 2012 WL 983696, at *19.

Second, Dr. Schoenwald's opinion was consistent with the opinions of Drs. Meyer and Vemuri. Dr. Meyer conducted multiple neuropsychological tests and concluded that Plaintiff's memory impairments affect both her short- and long-term memory. (*Id*. at 535). He opined that Plaintiff's "memory impairments suggest she will likely have limited ability to thrive in most academic and occupational settings." (*Id*.). After treating Plaintiff on a monthly basis for a year and conducting cognitive testing and examinations, Dr. Vemuri opined that Plaintiff retains poor-to-no ability to perform most work-related activities on a day-to-day basis in a regular work setting. (*Id*. at 583–86). Dr. Vemuri also concluded that because of her impairments, Plaintiff would likely miss four or more days of work per month. (*Id*. at 586).

The ALJ sought to undermine Dr. Schoenwald's reliance on Dr. Meyer's evaluation, contending that Plaintiff self-referred herself to Dr. Meyer. (R. at 87). While Dr. Meyer's report does indicate that Plaintiff self-referred herself to him (*id*. at 530), Dr. Vemuri explicitly stated that he referred Plaintiff to Dr. Meyer for testing (*id*. at 580). In any event, the ALJ does not explain how a self-referral undermines the results of Dr. Meyer's evaluation.

The ALJ also erroneously concluded that Plaintiff's average working memory and an average full scale IQ "impl[ies] the improbability of significant memory impairment affecting simple work." (*Id.* at 87). On the contrary, Dr. Meyer opined that her long-term memory limitations as well as her depression—not her intellectual abilities—affect her ability to thrive in academic and occupational settings and to independently engage in activities of daily living. (*Id.* at 535). "An ALJ must not substitute his own judgment for a physician's opinion without relying on other medical evidence or authority in the record." *Clifford*, 227 F.3d at 870; *see Rohan v. Chater*, 98 F.3d 966, 968 (7th Cir. 1996) ("As this Court has counseled on many occasions, ALJs must not succumb to the temptation to play doctor and make their own independent medical findings.").

The ALJ also discounted Dr. Schoenwald's reliance on Dr. Meyer's opinion because Plaintiff exaggerated her symptoms. (R. at 87). However, the ALJ's observation that Dr. Meyer found that Plaintiff "amplified" her impairments does not fully account for Dr. Meyer's opinion. Dr. Meyer concluded that Plaintiff "may have been amplifying her difficulties during the present evaluation." (*Id.* at 535). But after administering a Test of Memory Malingering, Dr. Meyer concluded that Plaintiff was not malingering. (*Id.* at 534). Therefore, Dr. Meyer opined that Plaintiff's "extreme" responses likely resulted from "unusually severe psychological problems." (*Id.* at 535). Indeed, Dr. Meyer concluded that Plaintiff "is overwhelmed by anxiety, tension, and depression," "feel[s] helpless and alone, inadequate and insecure," and is "likely functioning at a very low level of efficiency." (*Id.* at 533–34). Thus, Dr.

Meyer's testing and opinion supports Dr. Schoenwald's conclusion that Plaintiff's executive functioning capacities are impaired and her neurological and psychological problems combine to preclude her from employment. (*Id.* at 558).

The Commissioner contends that the ALJ properly discounted Dr. Schoenwald's opinion because he was not a mental health practitioner. (Dkt. 24 at 7). But the ALJ did not identify this as a reason for rejecting Dr. Schoenwald's opinion (R. at 87), and the Court must limit its review to the rationale offered by the ALJ, *see Chenery*, 318 U.S. at 90–93; *Hanson*, 760 F.3d at 762. In any event, Dr. Schoenwald's specialization, if any, goes to the weight to be afforded a treating source's opinion, 20 C.F.R. §§ 404.1527(c)(5), 416.927(c)(5), not whether the opinion can be rejected.

### 3. Summary

In sum, the ALJ failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the Court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth above, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall reevaluate the weight to be afforded to Dr. Vemuri's and Dr. Schoenwald's opinions. If the ALJ finds "good reasons" for not giving the opinions controlling weight, *see Campbell v. Astrue*, 627 F.3d 299, 306 (7th Cir. 2010), the ALJ shall explicitly "consider the length, nature, and extent of the treatment relationship, frequency of examination, the physician's specialty, the types of tests performed,

and the consistency and supportability of the physician's opinion," *Moss v. Astrue*, 555 F.3d 556, 561 (7th Cir. 2009), in determining what weight to give the opinions.

## B. The RFC Did Not Properly Account for Plaintiff's Mental Impairment

Plaintiff contends that the ALJ failed to properly assess her RFC. (Dkt. 19 at 13–14). She argues that the ALJ found Plaintiff's mental impairments cause moderate limitations in concentration, persistence, or pace, but the RFC was silent as to these limitations. (*Id.* at 13). "While [Plaintiff] may have retained the capacity to learn a job that required her to perform few simple, discreet tasks, the ALJ did not determine if moderate restrictions in concentration, persistence, or pace prevented her from performing the simple tasks at a level acceptable to employers." (*Id.* at 14).

"The RFC is an assessment of what work-related activities the claimant can perform despite her limitations." *Young*, 362 F.3d at 1000; see 20 C.F.R. § 404.1545(a)(1) ("Your residual functional capacity is the most you can still do despite your limitations."); Social Security Ruling (SSR)[18] 96-8p, at *2 ("RFC is an administrative assessment of the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her capacity to do work-related physical and mental activities."). The RFC is based upon medical

---

[18] SSRs "are interpretive rules intended to offer guidance to agency adjudicators. While they do not have the force of law or properly promulgated notice and comment regulations, the agency makes SSRs binding on all components of the Social Security Administration." *Nelson v. Apfel*, 210 F.3d 799, 803 (7th Cir. 2000); *see* 20 C.F.R. § 402.35(b)(1). While the Court is "not invariably *bound* by an agency's policy statements," the Court "generally defer[s] to an agency's interpretations of the legal regime it is charged with administrating." *Liskowitz v. Astrue*, 559 F.3d 736, 744 (7th Cir. 2009).

evidence as well as other evidence, such as testimony by the claimant or his friends and family. *Craft v. Astrue*, 539 F.3d 668, 676 (7th Cir. 2008). In assessing a claimant's RFC, "the ALJ must evaluate all limitations that arise from medically determinable impairments, even those that are not severe," and may not dismiss evidence contrary to the ALJ's determination. *Villano*, 556 F.3d at 563; *see* 20 C.F.R. § 404.1545(a)(1) ("We will assess your residual functional capacity based on all relevant evidence in your case record."); SSR 96-8p, at *7 ("The RFC assessment must include a discussion of why reported symptom-related functional limitations and restrictions can or cannot reasonably be accepted as consistent with the medical and other evidence.").

The ALJ determined that Plaintiff was moderately limited in her ability to maintain concentration, persistence or pace. (R. at 85). After examining the medical evidence and giving partial credibility to some of Plaintiff's subjective complaints, the ALJ found that Plaintiff can perform a full range of work at all exertional levels but with these nonexertional limitations: "no public contact work, no team coordination, must work alone, only routine, repetitive work that stays the same day-to-day to limit the number of new details that require learning." (*Id.* at 87–90). Based on the ALJ's RFC assessment and the VE's testimony, the ALJ determined that Plaintiff is capable of performing past relevant work as a hand packer and personal assistant. (*Id.* at 90).

In the Seventh Circuit, "both the hypothetical posed to the VE and the ALJ's RFC assessment must incorporate all of the claimant's limitations supported by the

medical record." *Yurt v. Colvin*, 758 F.3d 850, 857 (7th Cir. 2014); *see O'Connor–Spinner v. Astrue*, 627 F.3d 614, 619 (7th Cir. 2010) ("Our cases, taken together, suggest that the most effective way to ensure that the VE is apprised fully of the claimant's limitations is to include all of them directly in the hypothetical."); *Indoranto*, 374 F.3d at 473–74 ("If the ALJ relies on testimony from a vocational expert, the hypothetical question he poses to the VE must incorporate all of the claimant's limitations supported by medical evidence in the record."); *see also* SSR 96–5p, at *5 (RFC assessment "is based upon consideration of all relevant evidence in the case record, including medical evidence and relevant nonmedical evidence"); 20 C.F.R. § 404.1545. "Among the mental limitations that the VE must consider are deficiencies of concentration, persistence, or pace." *Varga v. Colvin*, 794 F.3d 809, 813 (7th Cir. 2015); *see Stewart v. Astrue*, 561 F.3d 679, 684 (7th Cir. 2009) (hypothetical question "must account for documented limitations of 'concentration, persistence, or pace'"). Although it is not necessary that the ALJ use the precise terminology of "concentration," "persistence," or "pace," the Court cannot assume that a VE is apprised of such limitations unless he or she has independently reviewed the medical record. *Varga*, 794 F.3d at 814; *Yurt*, 758 F.3d at 857. Here, there is no evidence that the VE reviewed Plaintiff's medical history or heard testimony about Plaintiff's moderate limitations in concentration, persistence, or pace. (*See* R. at 49–60).

The ALJ concluded that Plaintiff has moderate difficulties maintaining concentration, persistence, or pace. (R. at 85). But the ALJ did not address these difficul-

ties in the hypothetical questions he posed to the VE. (*Id.* at 49–60). "Because a hypothetical posed to a VE must incorporate *all* of [Plaintiff's] limitations supported by the medical record—including moderate limitation in concentration, persistence, and pace— . . . the ALJ committed reversible error." *Varga*, 794 F.3d at 814 (emphasis in original); *see Yurt*, 758 F.3d at 857 (failure of ALJ to include in hypothetical moderate difficulties in concentration, persistence, and pace was reversible error).

Instead of posing a hypothetical that included moderate limitations in concentration, persistence or pace, the ALJ posited a person limited to routine, repetitive, and simple tasks. (R. at 50). These terms refer to "unskilled work," which the regulations define as work that can be learned by demonstration in less than 30 days. 20 C.F.R. §§ 404.1568, 404.1520. But "whether work can be learned in this manner is unrelated to the question of whether an individual with mental impairments—*e.g.*, with difficulties maintaining concentration, persistence, or pace—can perform such work." *Varga*, 794 F.3d at 814. For this reason, the Seventh Circuit has repeatedly rejected the idea that a hypothetical like the one here "confining the claimant to simple, routine tasks and limited interactions with others adequately captures temperamental deficiencies and limitations in concentration, persistence, and pace." *Yurt*, 758 F.3d at 858–59 (citing *Stewart*, 561 F.3d at 685 (collecting cases)); *see also Craft*, 539 F.3d at 677–78 (restricting claimant to unskilled, simple work does not account for his difficulty with memory, concentration, and mood swings); *Young*, 362 F.3d at 1004.

The ALJ's hypothetical also clarified that the individual would need to work alone without public contact. (R. at 50). But these limitations also fail to account for Plaintiff's moderate difficulties in maintaining concentration, persistence, or pace. Limited interaction with supervisors, coworkers and the public "deals largely with workplace adaption, rather than concentration, pace, or persistence." *Varga*, 794 F.3d at 815.

In sum, the ALJ failed to "build an accurate and logical bridge from the evidence to her conclusion." *Steele*, 290 F.3d at 941 (internal quotation omitted). This prevents the court from assessing the validity of the ALJ's findings and providing meaningful judicial review. *See Scott*, 297 F.3d at 595. For the reasons set forth herein, the ALJ's decision is not supported by substantial evidence. On remand, the ALJ shall pose a hypothetical question that explicitly "account[s] for documented limitations of 'concentration, persistence, or pace.'" *Stewart*, 561 F.3d at 684.

## C. Other Issues

Because the Court is remanding on the treating physician and RFC issues, the Court chooses not to address Plaintiff's other arguments. Nevertheless, on remand, after determining the appropriate weight to be afforded the treating physicians' opinion, the ALJ shall reassess Plaintiff's credibility with due regard for the full range of medical evidence. The ALJ shall then reevaluate whether Plaintiff has an impairment or combination of impairments that meet or medically equal the severity of any of the listings enumerated in the regulations. The ALJ shall then reevaluate Plaintiff's mental impairments and RFC, considering all of the evidence of rec-

ord, including Plaintiff's testimony, and shall explain the basis of his findings in accordance with applicable regulations and rulings. Finally, with the assistance of a VE, the ALJ shall determine whether there are jobs that exist in significant numbers that Plaintiff can perform.

## VI. CONCLUSION

For the reasons stated above, Plaintiff's Motion for Reversal [19] is **GRANTED**, and Defendant's Motion for Summary Judgment [23] is **DENIED**. Pursuant to sentence four of 42 U.S.C. § 405(g), the ALJ's decision is reversed, and the case is remanded to the Commissioner for further proceedings consistent with this opinion.

E N T E R:

Dated: October 13, 2015

_____
MARY M. ROWLAND
United States Magistrate Judge